**Janice Harbin JOSEPH, as Personal Representative of the Estate of Ricardo Harbin, Plaintiff,**

v.

**CITY OF DETROIT, John Doe, Precinct Detention Officer, and John Roe, Precinct Desk Supervisor, Defendants.**

No. 02–71653.

United States District Court, E.D. Michigan, Southern Division.

Sept. 30, 2003.

---

Michael J. Yockey, Yockey, Yockey, Farmington Hills, MI, David A. Robinson, Robinson Russell, Southfield, MI, for Plaintiff.

Laurel F. McGiffert, Plunkett & Cooney, Miriam L. Blanks-Smart, Law Department, Krystal A. Crittendon, Detroit, MI, for Defendant.

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Janice Harbin Joseph, the personal representative of the Estate of Ricardo Harbin (Plaintiff's brother), commenced this suit on March 27, 2002 in Wayne County Circuit Court, State of Michigan, alleging that the Defendant City of Detroit and two unknown Detroit police officers violated Mr. Harbin's rights under the U.S. Constitution by failing to provide or secure medical treatment while he was in their custody. Mr. Harbin was arrested and taken into custody on a traffic offense, and complained of chest pains soon after he was placed in a cell at the Defendant City's Sixth Precinct station house. The officers on duty waited over five hours before arranging for Mr. Harbin to be transported to Detroit Receiving Hospital, where he died about twelve hours later. Plaintiff alleges that this conduct was the result of an unlawful municipal custom, policy, or practice which violated Mr. Harbin's rights under the Fourth, Eighth, and

Fourteenth Amendments.[1] The Defendant City of Detroit removed the case to this Court on April 25, 2002, citing Plaintiff's assertion of federal claims under 42 U.S.C. § 1983.

On September 30, 2002, Defendant filed the present motion for summary judgment, arguing that Plaintiff has failed to demonstrate that a municipal custom or policy was the moving force behind any constitutional injury suffered by Mr. Harbin. Plaintiff filed a response in opposition to this motion on October 28, 2002, and Defendant filed a reply in further support of its motion on November 15, 2002. More recently, Defendant filed a supplemental brief on February 4, 2003, largely devoted to a discussion of a deposition taken in another death-in-custody case of a witness, Ursula Henry, who has provided an affidavit in support of Plaintiff's claims in this case.[2]

On March 6, 2003, the Court heard argument on Defendant's motion for summary judgment. Having considered the arguments of counsel at this hearing, and having reviewed the parties' briefs and the other materials in the record, the Court is now prepared to rule on this motion. This Opinion and Order sets forth the Court's rulings.

## II. FACTUAL BACKGROUND

The factual record in this case is limited and, for present purposes, largely undisputed. At around 9:30 p.m. on August 28, 2000, Detroit police stopped a vehicle driven by Ricardo Harbin for running a stop sign. Mr. Harbin was arrested for driving without an operator's permit, and his passenger, Troy Washington, was arrested on an outstanding felony warrant from another jurisdiction. Both men were taken to the Sixth Precinct station house, where they were initially placed in a holding cell in the booking area.

According to Washington, Mr. Harbin began complaining of chest pains shortly after arriving at the station house, or at around 10:00 p.m. Washington testified that an officer was nearby at the time, and that this officer acknowledged Harbin's complaints by turning to look at him. Throughout the 30–45 minutes that Washington and Harbin remained together in the holding cell, Harbin repeatedly stated that he was suffering from chest pains, but no action was taken to address these complaints. Washington further testified that Harbin periodically clutched his chest during the period the two men shared a cell, and that he appeared to have "a light sweat." (Plaintiff's Response, Ex. 4, Washington Dep. at 14.)[3]

Washington and Harbin subsequently were moved from the holding tank to separate single-person cells. Washington testified that he awoke in the early morning hours to hear Harbin calling to the pre-

---

1. Plaintiff also has asserted federal and state-law claims against two unknown "John Doe" defendants, the precinct detention officer and precinct desk supervisor who were on duty at the time. Because these individuals have not been identified in this suit, the remainder of this Opinion addresses only the claims against the Defendant City.

2. Defendant also has filed a motion to strike Ursula Henry's affidavit. For reasons that will become clear, this motion has been rendered moot by the Court's ruling on Defendant's summary judgment motion.

3. Washington testified that, at one point during this period, Harbin spoke to a passing police sergeant who he apparently knew, and that the sergeant removed Harbin from the holding cell and walked him around the corner. Mr. Harbin and the sergeant had a brief discussion that Washington could not hear, and then Harbin was returned to the holding cell. Washington testified that Mr. Harbin was holding his chest as he returned to the cell.

cinct officer on duty, again complaining of chest pains. According to Washington, Harbin repeatedly called out, "Jailer, I'm having heart trouble. Jailer, man down." (*Id.* at 22.) Washington witnessed an officer walk down toward Harbin's cell, and then return to his station. About 20–30 minutes later, the officer again walked toward Harbin's cell, and this time returned with Harbin, who was slumped over and holding his chest.

A report prepared by the special investigative unit of the Detroit police department states that Harbin complained of chest pains at around 3:00 a.m. on August 29, 2000, about five hours after he arrived at the Sixth Precinct station house. (*See* Defendant's Motion, Ex. A, Special Investigative Unit Report at 1.)[4] This information was conveyed to the officer in charge of the station, who requested a scout car to transport Harbin to the hospital. At around 3:40 a.m., the car arrived and Harbin was taken to Detroit Receiving Hospital. The hospital records indicate that Harbin's pain was brought under control, and that various tests were administered. Just before 3:00 p.m. that afternoon, however, Harbin became unresponsive, and efforts to revive him failed. He was pronounced dead at 3:11 p.m. on August 29, 2000, just under 12 hours after he was taken to the hospital.

The Wayne County medical examiner performed an autopsy, and determined that Harbin died from arteriosclerotic cardiovascular disease. (*See* Plaintiff's Response, Ex. 6.) The medical examiner found that "[c]ocaine abuse was present," and that this "may have contributed to" Harbin's death, "as it is known to accelerate heart disease." (*Id.*) The examiner also noted that a chemical analysis of Harbin's urine revealed "two cocaine breakdown products." (*Id.*) More generally, the medical examiner reported several symptoms of heart disease, as well as indications of chronic pancreatitis.

The Detroit police convened a board of review to investigate the incident. The board concluded that department procedures had been followed, where Harbin purportedly had not complained of chest pains until he had been at the station house for five hours.[5] (*See* Defendant's Motion, Ex. A, Special Investigative Unit Report at 2.) At this point, according to the board, Harbin's complaints were "immediately" conveyed to the officer in charge of the station, and a scout car was "immediately" ordered to transport Harbin to the hospital. (*Id.*) The board found that this handling of the situation comported with the relevant Detroit police policy, which requires that prisoners suffering from heart conditions or complaining of illness "shall be sent to Detroit Receiving Hospital as soon as possible." (*Id.* (quoting Detroit Police Department Manual, Vol. III, ch. 2, § 6.1)) Two Special Investigative Unit officers subsequently reviewed and concurred in the board's findings, recommending that the matter be closed "with a finding of 'Proper Conduct.' " (*Id.* at 3.) These recommendations apparently were adopted, with no disciplinary measures being imposed as a result of Mr. Harbin's death.[6]

---

4. This report does not indicate that Harbin had complained of chest pains at any point prior to 3:00 a.m. For present purposes, however, the Court must accept as true Washington's testimony that Harbin first voiced these complaints at about 10:00 p.m.

5. As noted by Plaintiff, the board of review apparently did not seek to interview Troy Washington, who presumably would have stated that Mr. Harbin began complaining of chest pains soon after arriving at the station.

6. As noted, Plaintiff's complaint names the City of Detroit and two "John Doe" police officers as Defendants. To date, no named Defendants have been substituted in place of the "John Doe" parties. Rather, upon discovering the identities of these two officers, Plaintiff elected to pursue a separate state-

## III. *ANALYSIS*

### A. The Standards Governing Defendant's Motion

Defendant brings its present motion under both Fed.R.Civ.P. 12(b)(6) and Fed. R.Civ.P. 56. Because the Court has considered matters outside the pleadings, this motion will "be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b). Under this Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. *Celotex* explains:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing this trilogy of Supreme Court decisions, the Sixth Circuit adopted a series of principles governing motions for summary judgment:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

court action against them. Although these officers attempted to remove this separate suit to this Court and consolidate it with the present case, they failed to act within the 30–day period set forth in the removal statute. Accordingly, the Court recently granted Plaintiff's motion to remand this second action to state court. As a result, only the claims against the City remain before this Court.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving Defendant's motion.

**B. The Standards for Municipal Liability under 42 U.S.C. § 1983**

■ Although Plaintiff's complaint cites three separate constitutional provisions, her claims are most appropriately analyzed under the Fourteenth Amendment. "Where prison officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment in violation of the Eighth Amendment." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)). A pretrial detainee such as Mr. Harbin, however, is "analogously protected from such mistreatment under the Due Process Clause of the Fourteenth Amendment." *Horn*, 22 F.3d at 660 (citing *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979)).

■ In this case, the only Defendant specifically named in Plaintiff's complaint is the City of Detroit. A municipal Defendant "cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir.2000) (citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978)). Instead, "[f]or liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort." *Gregory*, 220 F.3d at 441. Moreover, Plaintiff must establish that "through its deliberate conduct, the municipality was the 'moving force' behind" the violation of Mr. Harbin's constitutional rights—that is, she "must show that the municipal action was taken with the requisite degree of culpability and

must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Gregory*, 220 F.3d at 442 (quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 1389, 137 L.Ed.2d 626 (1997)).

Juxtaposing these two lines of authority, Plaintiff must establish that officers at the Sixth Precinct station house were deliberately indifferent to the serious medical needs of Mr. Harbin, and that these officers so acted (or failed to act) pursuant to a municipal policy or custom. Although Defendant's motion devotes little attention to the first of these inquiries, the Court finds that it warrants more extensive scrutiny. Accordingly, the Court turns to this issue.

**C. The Record Fails as a Matter of Law to Establish Deliberate Indifference to Mr. Harbin's Serious Medical Needs.**

As noted, the federal constitutional right implicated in this case is Mr. Harbin's Fourteenth Amendment right as a pretrial detainee "to adequate medical treatment," a guarantee "analogous to the Eighth Amendment rights of prisoners." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685–86 (6th Cir.2001). This protection is denied only where government officials act with "deliberate indifference to serious medical needs." *Watkins*, 273 F.3d at 686 (quoting *Estelle*, 429 U.S. at 104, 97 S.Ct. at 291, 97 S.Ct. 285).

The "deliberate indifference" inquiry has both objective and subjective components. First, in cases involving an inmate's or detainee's medical needs, the need "must be, objectively, sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994) (internal quotations and citation omitted); *see also Estelle*, 429 U.S. at 104, 97 S.Ct. at

291. Regarding the subjective component, the Sixth Circuit has explained:

> Deliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the detainee's] health and safety. *Farmer v. Brennan,* 511 U.S. 825, 835–37, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This standard is subjective. It is not enough that there was a danger of which an officer should objectively have been aware. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811. If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments. *Id.* at 837–38, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811.

*Watkins,* 273 F.3d at 686.

■ At first blush, it would appear that the objective, "serious harm" prong of this inquiry is readily satisfied here, in light of Mr. Harbin's death from arteriosclerotic cardiovascular disease within 18 hours of his initial detention and complaints of chest pain. Yet, this matter requires more careful scrutiny, because the Defendant City and its officers did not altogether *deny* medical treatment to Mr. Harbin, but instead *delayed* it for several hours. In order to show that this delay rose to the level of a constitutional violation, Plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County,* 238 F.3d 739, 742 (6th Cir.2001) (internal quotations and citation omitted).

Defendant argues, and the Court agrees, that the medical records from Detroit Receiving Hospital do not demonstrate any such detrimental effect, as they indicate that Mr. Harbin's condition had stabilized soon after he arrived at the hospital, and that he died following a relapse nearly twelve hours later. In particular, a summary of Mr. Harbin's treatment states that he "presented ... with complaints of chest pain," but that he "remained chest pain free" following initial treatment. (Defendant's Motion, Ex. E at A34.) This report further states that the results of an echocardiogram were normal, and there are no indications in this report or elsewhere that Mr. Harbin's subsequent heart failure might have been attributable to damage suffered during the few hours he was held at the Sixth Precinct station. Nothing in these records, therefore, suggests that Mr. Harbin's death could have been avoided if he had received more prompt medical treatment.

The only additional medical evidence offered by Plaintiff on this point is an affidavit from cardiologist James E. Davia, M.D. Based on his review of the hospital records, the autopsy report, and the testimony of Troy Washington, Dr. Davia states that "it is more probable than not that Ricardo Harbin suffered cardiac related, significant, reasonably intense chest pains during the period of hours when he was incarcerated by the Detroit Police Department and prior to the time that he received medical attention." (Plaintiff's Response, Ex. 11, Davia Aff. at ¶ 5.) Dr. Davia further opines that "it is more probable than not that the intense chest pain would be almost immediately alleviated by the administration of pharmaceuticals coincident with or very shortly following arrival at the hospital," and that Mr. Harbin likely "suffered worry and anxiety concerning a then impending heart attack" prior to being transported to the hospital for treatment. (*Id.* at ¶¶ 6, 7.) Notably, Dr. Davia does not state that Mr. Harbin's death could have been avoided if he had

been promptly taken to the hospital upon his first complaints of chest pain, nor does he opine that the delay in treatment was a contributing factor in Mr. Harbin's death.

■ Accordingly, the Court finds that Plaintiff has not produced "verifying medical evidence" that links Mr. Harbin's death to a delay in treatment.[7] Rather, the "detrimental effect" of this delay is limited to the additional pain, worry, and anxiety Mr. Harbin suffered while awaiting treatment of his medical condition. Neither party has addressed the issue whether such harms are sufficiently "serious" to satisfy the objective prong of the "deliberate indifference" inquiry. Nor has the Court's own research disclosed a definitive answer to this question. The Sixth Circuit has recognized, albeit in an unpublished decision, that "subjective feelings of pain may, if sufficiently egregious, satisfy the objective component of *Farmer*." *Vaughn v. City of Lebanon*, 2001 WL 966279, at *21 (6th Cir. Aug.16, 2001). For purposes of this Opinion, then, the Court will assume that this objective standard has been met here, where Plaintiff's medical expert has opined as to a probability of "significant, reasonably intense chest pains" during Mr. Harbin's five hours of confinement.

This leaves the subjective inquiry whether the detaining officers "knew of and disregarded a substantial risk of serious harm to [Mr. Harbin's] health and safety," *Watkins*, 273 F.3d at 686, where the harm in question is the pain, worry, and anxiety suffered by Mr. Harbin as he awaited medical treatment over a 5 or 6 hour period of detention.[8] Here, Plaintiff faces a significant evidentiary hurdle. The only record of Mr. Harbin's initial complaints of chest pain is found in the deposition testimony of cellmate Troy Washington. The materials produced by the Defendant City, in contrast, deny that Mr. Harbin reported chest pain or any other medical need at any time before 3:00 a.m. on August 29, 2000, and it is undisputed that Mr. Harbin was provided medical attention within a short time thereafter. Thus, Plaintiff faces the difficult task of establishing the subjective prong of the "deliberate indifference" standard without *any* evidence or testimony from the detaining officers as to what they knew or concluded about Mr. Harbin's need for medical attention during the first several hours of his detention.

The Court finds that this evidentiary obstacle is insurmountable. Troy Washington's deposition testimony would at best support the inference that one or more detaining officers were aware of Mr. Harbin's complaints of chest pain and took no action. Washington testified, in particular, that Mr. Harbin complained more than once during their 30–45 minutes together in the holding cell, and that a nearby detaining officer acknowledged these reports of chest pain by looking over at the cell. Yet, there is no way to determine what sorts of conclusions the detaining officers might have drawn from this information. This is a crucial evidentiary gap, in light of the legal requirement that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979 (emphasis added). Thus, if the detaining officers "fail[ed] to act in the face of an obvious risk of which [they] should have known *but did not*," they would not have violated Mr.

---

7. Plaintiff's counsel conceded this point at the March 6 hearing, acknowledging that the record fails to support any recovery of wrongful death damages.

8. Again, the Court emphasizes that the "harm" here is not Mr. Harbin's fatal heart condition, as there is no verifying medical evidence that any delay in medical treatment caused or worsened this condition.

Harbin's Fourteenth Amendment rights. *Watkins*, 273 F.3d at 686 (emphasis added).

Here, the most that can be said is that Mr. Harbin's complaints of chest pain reflected a substantial risk of serious harm. There is absolutely no evidence, however, that any detaining officer actually perceived this risk. Under the existing record, it is a matter of sheer speculation whether one or more officers fully understood the risk of harm entailed in Mr. Harbin's complaints and simply disregarded it, or whether, for example, the officers who heard these complaints dismissed them as unworthy of credence. Yet, a trier of fact necessarily would have to resolve this issue, because an officer is not deliberately indifferent to a detainee's medical needs if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844, 114 S.Ct. at 1982; *see also Weaver v. Shadoan*, 340 F.3d 398, 412 (6th Cir.2003) (reasoning that a defendant officer's contemporaneous report that the plaintiff detainee was "faking" an illness "suggest[s] that [the officer] did not draw an inference or have the subjective belief that [the plaintiff] was in substantial risk of serious harm"). Stated differently, "it is not enough for plaintiff to demonstrate a question of fact whether the [detaining] officers ... *should have* known" that Mr. Harbin's complaints reflected actual, serious medical needs. *Watkins*, 273 F.3d at 686.

To be sure, *Farmer* recognizes that an officer's subjective knowledge of a substantial risk of serious harm need not come directly from the horse's mouth, but instead is "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842, 114 S.Ct. at 1981. The record lacks any such evidence, however. Certainly,

nothing in Troy Washington's testimony indicates that any detaining officer perceived a risk of harm to Mr. Harbin. As noted, the lack of reaction to Mr. Harbin's complaints is just as suggestive of a determination that these complaints were overblown as of a conclusion that Mr. Harbin was in actual need of medical treatment. There simply is no evidentiary ground upon which a trier of fact could choose between these or other possibilities.

This leaves only one potential avenue of proof—namely, that a factfinder might "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842, 114 S.Ct. at 1981. The record here falls well short of establishing such an "obvious" risk, where Mr. Harbin's complaints of pain were unaccompanied by any surrounding circumstances that would compel an inference of a serious medical condition. There is no evidence, for instance, that he was exhibiting any other symptoms of heart disease—Troy Washington testified that he was sweating only lightly, and that he was able to accompany a sergeant out of the holding cell and around the corner for a brief discussion. Neither does the record contain any evidence that Mr. Harbin was taking heart medication, or that any detaining officer, or even Mr. Harbin himself, was aware of a pre-existing heart condition which, when combined with complaints of chest pain, might have warranted greater diligence or scrutiny. This Court is unwilling to say that a few reports of chest pain over a brief 30–45 minute period, standing alone, bespeak such an "obvious" risk of a serious medical condition that they would permit an inference that a detaining officer actually perceived this risk. *Cf. Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir.1999) (observing that complaints of breathing problems and chest pains "are, objectively speaking, relatively minor," and thus not

"constitutionally actionable"); *Oliver v. Deen,* 77 F.3d 156, 159–60 (7th Cir.1996). *Compare Sealock v. Colorado,* 218 F.3d 1205, 1208, 1210 (10th Cir.2000) (finding that a claim of deliberate indifference survived summary judgment where the defendant officer observed the plaintiff "at a time when he was very pale, sweating and had been vomiting," and where both the plaintiff and his cellmate told the defendant that he was experiencing chest pain and "might be having a heart attack," but where the defendant responded by telling the plaintiff "not to die on his shift").[9]

This Court, like others, recognizes that the subjective prong of the "deliberate indifference" standard is not easily met. *See Farmer,* 511 U.S. at 842, 114 S.Ct. at 1981 (acknowledging the prisoner's concern in that case that a subjective test might encourage prison officials "to take refuge in the zone between 'ignorance of obvious risks' and 'actual knowledge of risks' " (internal quotations and citation omitted)); *see also Watkins,* 273 F.3d at 687 (Moore, J., dissenting) ("Showing that the official drew the required inference may be difficult in cases such as this."). The Court also acknowledges that this standard as applied here yields an arguably harsh result—though, it must be noted, Plaintiff and her counsel compounded this burden by focusing their discovery efforts on broad municipal policy considerations rath-

er than the specific facts surrounding Mr. Harbin's detention. Yet, the relevant law has been enunciated with unmistakable clarity in *Farmer* and its progeny, and this Court is bound to follow it. Specifically, in the absence of evidence that could satisfy the subjective prong of the "deliberate indifference" standard, the Court finds that Plaintiff has failed as a matter of law to establish a violation of Mr. Harbin's Fourteenth Amendment rights. Moreover, in the absence of any such constitutional injury, it readily follows that Plaintiff's § 1983 claims against the Defendant City cannot survive summary judgment. *See Watkins,* 273 F.3d at 687; *Scott v. Clay County,* 205 F.3d 867, 879 (6th Cir.2000).[10]

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's September 30, 2002 Motion for Summary Judgment is GRANTED. In light of this ruling, IT IS FURTHER ORDERED that Defendant's December 23, 2002 Motion to Strike Affidavit and Testimony of Attorney Ursula Henry is DENIED AS MOOT.

---

9. Notably, in *Sealock,* the Court affirmed a grant of summary judgment in favor of a nurse who examined the plaintiff and "[a]t worst ... misdiagnosed" him by failing to discern that he was suffering a major heart attack. *Sealock,* 218 F.3d at 1208, 1211. If a medical practitioner is entitled to misdiagnose a detainee without fear of § 1983 liability, it surely follows that a detaining officer with no medical training is entitled to a degree of latitude in his assessment of a detainee's health complaints. *See, e.g., Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1187 (11th Cir.1994) (distinguishing between physician diagnosis and a lay person's

assessment in determining whether an inmate has manifested a "serious" medical need).

10. In its motion, the Defendant City also requests summary judgment in its favor as to the state-law claims purported asserted against it. Upon reviewing the complaint, however, the Court is unable to discern any such state-law claims being pursued against the City. In any event, Plaintiff does not address any such claims in her response to Defendant's motion. If any such claims ever were asserted, therefore, the Court deems them to have been abandoned.