**Brandi JONES, Individually and as Personal Representative of the Estate of Alarice McDougal–Stewart, deceased, Plaintiff,**

v.

**OAKLAND COUNTY, Peggy Osta, and Miranda Olson, Defendants.**

**Case No. 06–13719.**

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 30, 2008.

Martin G. Deutch, Martin Gary Deutch Assoc., Southfield, MI, for Plaintiff.

Keith J. Lerminiaux, Oakland County Corporation Counsel, Pontiac, MI, for Defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GERALD E. ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Brandi Jones, the personal representative of the estate of Alarice McDougal–Stewart, commenced this suit in this Court on August 21, 2006, alleging that Defendant Oakland County and two employees at the Oakland County Jail, Defendants Peggy Osta and Miranda Olson, violated Ms. McDougal–Stewart's rights under the U.S. Constitution and were grossly negligent in their failure to provide appropriate medical treatment to Ms. McDougal–Stewart while she was incarcerated in the Oakland County Jail in June of 2004.[1] Specifically, on the morning of June 24, 2004, following Ms. McDougal–Stewart's arrest two days earlier on a bench warrant for failure to appear at a court proceeding, Ms. McDougal–Stewart was found unresponsive in her cell and could not be revived. It was subsequently determined that she died of heart failure (ischemic cardiomyopathy). This Court's subject matter jurisdiction rests upon Plaintiff's assertion of federal constitutional claims under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

Through the present motion, filed on July 2, 2007, Defendants seek an award of summary judgment in their favor on Plaintiff's federal and state-law claims. In support of this motion, Defendants argue that Plaintiff has failed to produce evidence of the individual Defendants' deliberate indifference to Ms. McDougal–Stewart's serious medical needs, and that there likewise is no evidence that any Oakland County policy or custom caused a violation of Ms. McDougal–Stewart's federal constitutional rights. Defendants further contend that the record fails to establish that the actions of the individual Defendants amounted to gross negligence, as necessary to support tort liability under Michigan law.

Plaintiff filed a response to Defendants' motion on August 13, 2007. Although the Court certainly feels compassion and sadness for the untimely death of Ms. McDougal–Stewart and the resulting loss to her family, Plaintiff's response brief is, unfortunately, far more notable for counsel's unhelpful rhetorical flourishes and unsupported accusations than for its careful, thoughtful analysis of the record under the governing legal standards. To cite just a few examples, Plaintiff's counsel states near the outset that Ms. McDougal–Stewart was "[s]omeone to be ignored" and was "not a person, but just another 'B/F'," and that the county employees with whom she interacted at the jail "were more interested in checking the boxes on their forms and moving up to their next jobs." (Plaintiff's Response Br. at 2.)[2]

1. Apart from naming Oakland County and two of its employees as defendants, Plaintiff initially named the City of Pontiac and certain of its employees as additional parties to this suit. The Pontiac defendants have been dismissed from the case, however, leaving only the County and its two employees as defendants.

2. The Court also is struck by an inapt analogy drawn by counsel later in Plaintiff's response brief, (*see* Plaintiff's Response Br. at 6), where counsel paraphrases an observation by Justice Potter Stewart—which counsel incorrectly attributes to Justice Hugo Black—that he could not define hard-core pornography "[b]ut I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring). In stark contrast to the murky standards then governing obscenity law, the courts have developed reasonably thorough and clear standards over the past several decades for determining whether a government official has acted with deliberate indifference. As discussed below, the Court finds that these standards are not overly difficult to apply here, and lead to a fairly unmistakable result.

Though Plaintiff's legal arguments are somewhat obscured by these descents into grandiloquence, she contends, in essence, that Defendants' deliberate indifference is established through the failure of jail officials to provide Ms. McDougal–Stewart with any medical treatment during her incarceration despite evidence that Plaintiff views as indicative of a serious medical condition.

Having reviewed the parties' briefs in support of and in opposition to Defendants' motion, the accompanying exhibits, and the record as a whole, the Court finds that the relevant facts, allegations, and legal arguments are adequately presented in these written materials, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Defendants' motion "on the briefs." *See* Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on this motion.

## II. *FACTUAL BACKGROUND*

The factual record in this case is essentially undisputed. In early June of 2004, the Pontiac police department obtained a warrant for felonious assault against Alarice McDougal–Stewart.[3] Plaintiff was arraigned on this offense and released on bond. When she failed to make a required court appearance, a bench warrant was issued, and Plaintiff was arrested by the Pontiac police pursuant to this warrant on June 22, 2004.

While at the Pontiac police station, Plaintiff complained of chest pains and shortness of breath and was taken to the Pontiac Osteopathic Hospital. She was discharged from the hospital at about 6:15 p.m. on June 22, 2004, with instructions to "[t]ake meds as directed," "rest," "return if worsen," and "see your family doctor for recheck [in] 2–4 days." (Defendant's Motion, Ex. 2, Discharge Instructions.) In addition, a hospital physician issued a prescription for Motrin and a note stating that Plaintiff was "medically cleared for continued incarceration." (*Id.*)

Following her discharge from the hospital, Plaintiff was taken by the Pontiac police to the Oakland County Jail to be housed pending further court proceedings. She was booked into the jail at around 6:52 p.m. According to the booking clerk, Kori Short, the booking process entailed, among other things, asking Plaintiff a number of questions about her medical conditions and needs. Short testified that Plaintiff's responses to these inquiries, as well as her observation of Plaintiff, led her to determine (and to enter into the jail's computer system) that Plaintiff was not presently suffering from obvious pain, injury, or any other condition that required emergency medical services, and that she was not carrying or taking any prescription medication. (*See* Plaintiff's Response, Ex. N, Short Dep. at 33–39; *see also* Defendant's Motion, Ex. 3 (computer printout).) Short further learned and reported that Plaintiff had been taken to the hospital that day for chest pains and that she took Motrin, (*see* Short Dep. at 43), and Short evidently placed the hospital discharge paperwork in a box for later review by the jail's medical staff, (*see id.* at 16, 22; *see also* Plaintiff's Response, Ex. Y, Morrisey Dep. at 33).[4]

---

**3.** Because Plaintiff Brandi Jones has brought this suit on behalf of the estate of Ms. McDougal–Stewart, and since the incidents at issue in this case involve only Ms. McDougal–Stewart, the Court will refer to her as the "Plaintiff" throughout the balance of this opinion.

**4.** Although this paperwork was reviewed by a physician at the jail clinic, evidently on the date of Plaintiff's booking, (*see* Morrisey Dep. at 32–33), the hospital's prescription for Motrin was not filled prior to Plaintiff's death two days later, on the morning of June 24, 2004.

Short testified that she has the ability to generate a "sick call slip" for an inmate to be promptly seen at the jail medical clinic—in cases where, for example, an inmate indicates that he or she uses prescription medication but has none in his or her possession, (*see* Short Dep. at 26–29)—but she did not do so in this instance.[5] Instead, the information obtained in the booking process led to a more routine screening or "triage" process as described by the jail's supervising nurse at the time, Mark Morrisey, under which Plaintiff's records were reviewed by medical personnel and she was to be seen at the jail clinic within the next few days. (Morrisey Dep. at 17–18, 34–35.)[6] No such clinic visit occurred, however, in the period of just under 48 hours between Plaintiff's June 22 booking and her death on the morning of June 24.

On June 23, 2004, the day after Plaintiff was booked into the Oakland County Jail, she was taken to court to be arraigned on the bench warrant. A witness who accompanied Plaintiff to the courthouse, Tammy Dickinson, has asserted in an unsworn statement that Plaintiff "fell ill" and "begg[ed] not to be forced to go to court," explaining that she was "nauseated [and] coming down from opium." (Plaintiff's Response, Ex. Q.) According to Dickinson, a sheriff's deputy told Plaintiff that "the only

way out of here was to go to court," and he then handed her a bag and "told her if she was to get sick it better be in the bag [and] not on his bus." (*Id.*) Dickinson further recounted that Plaintiff "slept [and] rocked for 8 hours" at the courthouse, getting sick to her stomach but not eating or drinking anything during this period. (*Id.*) Dickinson's account, however, is contradicted to some extent by the Oakland County sheriff's deputy who transported Plaintiff to court, Lonnie Hanna, who testified that although Plaintiff appeared to be ill and accepted his offer of a paper bag, she responded affirmatively when asked by the deputy whether she was okay to go to court. (*See* Defendant's Motion, Ex. 7, Hanna Dep. at 20; *see also* Defendant's Motion, Ex. 6, Hanna Narrative Report.)[7]

Following her June 23 court appearance, Plaintiff was returned to the Oakland County Jail. That night, her cell mate, Joy Batt, was awoken at some point by Plaintiff vomiting in the cell toilet. (*See* Defendant's Motion, Ex. 9, Narrative Report.) Batt reportedly asked Plaintiff if she was alright and if she needed help, and Plaintiff responded that she was fine and did not need any help. (*Id.*) Although jail deputies are required to make the rounds of all the jail cells and visually observe each inmate every 45 to 60 minutes, and although the record indicates this was

5. Although Plaintiff asserts that Short acted "contrary to jail procedures" in this regard, (Plaintiff's Response Br. at 4), she has not endeavored to explain precisely how Short's actions deviated from the cited jail procedures.

6. Morrisey testified that because Plaintiff had been cleared for incarceration by a hospital physician, and because she was scheduled to be in court on June 23, 2004, the day after her booking, it was likely that she would have been scheduled for a clinic visit "on a delayed basis" at some point after June 23. (*See id.* at 35.) Morrisey further opined that the jail's medical staff perhaps was awaiting Plaintiff's

clinic visit before filling the hospital's prescription for Motrin, but he acknowledged that this prescription could have been filled before Plaintiff was seen at the clinic. (*See id.* at 34–35.)

7. Deputy Hanna further testified that if an inmate is "complaining of being ill or complaining that they're not going to Court, I won't transport them." (Hanna Dep. at 21.) Instead, he would notify the jail clinic, and would advise the Pontiac police that they would need to arrange a "special pick-up" if they wished to ensure the inmate's presence in court. (*Id.*)

done on the night in question, no deputy reported observing the vomiting witnessed by Plaintiff's cell mate that night. Neither does the record otherwise disclose any report to or awareness by jail personnel that Plaintiff had experienced any sort of health problem during the night.

The following morning, June 24, 2004, Plaintiff met with a classification agent, Defendant Miranda Olson, at around 9:15 a.m. Olson testified that the purpose of this interview was to determine Plaintiff's security level within the jail, and to make referrals where appropriate for medical or mental health treatment. (*See* Plaintiff's Response, Ex. BB, Olson Dep. at 8–9.)[8] In the course of this interview, Plaintiff denied substance abuse, but indicated that she was taking Oxycontin for back pain as well as certain psychotropic medications for a bipolar disorder. (*See id.* at 22–24; *see also* Defendant's Motion, Ex. 10, Olson Witness Statement.) Based on this information, Olson referred Plaintiff to the jail clinic for medical care and to a counselor for mental health care. (Olson Dep. at 23–25.) Olson also asked Plaintiff about her June 22 hospital visit for chest pain, but Plaintiff indicated that she did not have any concerns about or require any treatment for this condition. (*See id.* at 43.)[9] More generally, during the course of the interview, Olson found that Plaintiff appeared to be "aware of where she was, she was oriented to where she was," and she further observed that Plaintiff was "[a]lert," that she "could easily comprehend what I was saying to her and re-

spond appropriately," and that she was not showing "any observable signs of pain." (*Id.* at 42, 47.)[10]

Based on her determination that Plaintiff was not in need of immediate medical attention, Olson planned to wait until the end of her shift—somewhere between 1:00 and 2:30 p.m.—to prepare and forward her referral paperwork to the counselors and the clinic. Before she could do so, however, Plaintiff was found unresponsive in her cell at around 11:00 a.m. Defendant Peggy Osta, a staff nurse at the jail, happened to be nearby distributing medications to other inmates, and she and other jail personnel began performing CPR and using a defibrillator in an effort to revive Plaintiff. These efforts were unsuccessful, and Plaintiff was pronounced dead at 11:45 a.m. on June 24, 2004. The autopsy lists Plaintiff's cause of death as ischemic cardiomyopathy. (*See* Defendants' Motion, Ex. 14.)

## III. *ANALYSIS*

### A. The Standards Governing Defendants' Motion

Through the present motion, Defendants seek summary judgment in their favor on Plaintiff's federal claims under 42 U.S.C. § 1983 as well as her state-law claims. Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

---

**8.** By the time of her deposition in this case, Ms. Olson's name had changed to Miranda Heemsth, (*see id.* at 5), but she will be referred to here under her name as it appears in the case caption.

**9.** Olson testified that if Plaintiff had expressed any concern about or given any signs of chest pain, she would have immediately referred her to the jail clinic. (*See id.* at 45, 48.) Since she did not, Olson did not make a

referral to the clinic based upon this condition, but only for Plaintiff's complaint of back pain. (*See id.* at 43.)

**10.** Plaintiff again suggests that Olson's interview of Plaintiff did not comport with the relevant jail procedures, (*see* Plaintiff's Response Br. at 5), evidently based largely upon Olson's testimony that this interview lasted between five and fifteen minutes, (*see* Olson Dep. at 46).

and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir.2006). Yet, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but "must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." Fed. R.Civ.P. 56(e)(2). Moreover, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

## B. Plaintiff's § 1983 Claims Against the Individual Defendants

### 1. The Standards Governing Eighth Amendment Claims

■ As the basis for her federal constitutional claims under 42 U.S.C. § 1983, Plaintiff cites the Eighth Amendment protection against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. As applied to inmates, this constitutional guarantee encompasses a right to medical care for serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976); *Perez v. Oakland County,* 466 F.3d 416, 423 (6th Cir.2006). Yet, because the Eighth Amendment prohibits only mis-treatment tantamount to "punishment," the courts have imposed liability upon prison officials only where they "are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain." *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir.1994) (citing *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291). Mere negligence or medical malpractice alone cannot sustain an Eighth Amendment claim, absent a showing of deliberate indifference. *See Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 291–92; *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999) (*en banc*).

■ The "deliberate indifference" inquiry has both objective and subjective components. *See Perez,* 466 F.3d at 423. First, in cases involving an inmate's medical needs, the need "must be, objectively, sufficiently serious." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994) (internal quotations and citation omitted); *see also Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Regarding the subjective component, the Sixth Circuit has emphasized that a plaintiff must produce evidence showing "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir.2001) (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). As the Supreme Court has explained, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer,* 511 U.S. at 838, 114 S.Ct. at 1979. This Court has observed that "the subjective prong of the 'deliberate indifference' standard is not easily met," as it requires evidence of what prison officials actually knew or believed,

and not merely what they should have perceived. *Joseph v. City of Detroit,* 289 F.Supp.2d 863, 872 (E.D.Mich.2003).

### 2. Plaintiff Has Failed to Establish that the Individual Defendants Were Deliberately Indifferent to Ms. McDougal–Stewart's Serious Medical Needs.

■ As is evident from the above recitation of facts, the two individual Defendants in this case, Miranda Olson and Peggy Osta, had only limited interactions with Plaintiff during her incarceration in the Oakland County Jail from the evening of June 22, 2004 until her death on the morning of June 24, 2004. Defendant Olson's only contact with Plaintiff was a classification interview lasting between five and fifteen minutes. Defendant Osta, in turn, first came into contact with Plaintiff when she was summoned to assist in CPR and other efforts to revive Plaintiff after she was found unresponsive in her jail cell. In support of their present motion, Defendants argue that there is no basis in the evidentiary record for concluding that either Miranda Olson or Peggy Osta, in their limited interactions with Plaintiff, perceived a substantial risk to Plaintiff's health and well-being and yet disregarded this risk. The Court agrees.

Turning first to Defendant Olson, Plaintiff faults her for having "chose[n] to do nothing at all" despite her awareness (i) that Plaintiff had been taken to the hospital two days earlier for complaints of chest pain and shortness of breath; (ii) that she was complaining of back pain; (iii) that she used prescription medication but had not taken any since her arrest two days earlier; and (iv) that the jail's medical personnel had failed to fill the Motrin prescription given to Plaintiff upon her discharge from the hospital. (Plaintiff's Response Br. at 8.) Yet, as an initial matter, it is inaccurate to say that Olson "did nothing" with this information. Instead, it was Olson who first determined—contrary to what Plaintiff evidently told the booking clerk, Kori Short, in the booking process two days earlier—that Plaintiff did in fact use prescription medication for back and mental health conditions. Upon learning of this, Olson decided that Plaintiff should be referred to the clinic and a counselor. While Plaintiff faults Olson for determining that delayed rather than immediate medical treatment was appropriate, this is not the same as "doing nothing" with the information Olson learned about Plaintiff's medical condition. Likewise, Olson did not ignore Plaintiff's hospital visit for chest pain, but instead asked Plaintiff whether she had any continuing concerns about or need for treatment of this condition. According to Olson, Plaintiff responded that she did not.

Next, and more importantly, none of these facts known to Olson would have given rise to the inference that Plaintiff faced a substantial health risk, particularly when combined with the additional information Olson learned during her interview with Plaintiff. Although Olson was aware that Plaintiff had been taken to the hospital two days earlier with complaints of chest pain, the records of this hospital visit do as much to discount a substantial health risk as to suggest one, where there is no indication in these records that Plaintiff was diagnosed with or suffered from a heart problem. Rather, Plaintiff was cleared for incarceration, told to rest and to visit her family physician within a few days, and prescribed a medication (Motrin) that is not suggestive of a heart condition. So far as the record reveals, then, if Olson had concluded that Plaintiff suffered from a heart condition, she would have been the first person to do so. Moreover, Plaintiff herself seemingly dispelled any lingering doubt about the severity, and perhaps even the existence, of this condition, as she denied to Olson that chest pains were a

concern or that a clinic visit was necessary to address this issue. (*See* Olson Dep. at 43.)

Nor are the remaining facts known to Olson indicative of a serious medical condition that required immediate attention. While Plaintiff had vomited in her cell the night before her interview with Olson, there is no evidence that Olson (or any other jail employee) was aware of this. Next, to the extent that Olson knew of the report of Sheriff's Deputy Lonnie Hanna that Plaintiff had "appeared ill" on the way to court the day before and was given a paper bag in case she got sick, Deputy Hanna further stated in his report and testified at his deposition that Plaintiff had indicated that she felt well enough to go to court. Finally, the remaining information elicited from Plaintiff during Olson's interview—namely, that she suffered from back and mental health conditions, and that she had been prescribed medication for these conditions but had not taken this medication during her incarceration—was not indicative of a serious or immediate medical need. Nor, more importantly, would the ailments disclosed to Olson or the lack of prescription medications for these conditions suggest Plaintiff's vulnerability to a heart condition that these medications were not intended to address and that, so far as the record discloses, Plaintiff was not known to suffer from. Under this record, Plaintiff cannot establish the first prong of the "subjective component" of the deliberate indifference inquiry—*i.e.*, that Olson knew of or perceived "facts from which to infer substantial risk to" Plaintiff. *Comstock*, 273 F.3d at 703.

Yet, even assuming that the information available to and learned by Defendant Ol-son was indicative of a substantial risk to Plaintiff's health, there is no evidence whatsoever in the record from which to conclude that Olson actually drew this inference but "then disregarded that risk." *Comstock*, 273 F.3d at 703. The record is quite clear as to the conclusions Olson drew based upon her review of the jail records and her interview with Plaintiff. Specifically, Olson testified that if Plaintiff had complained of chest pains or had given "observable signs of pain," she would have immediately referred her to the clinic for treatment. (Olson Dep. at 47–48.) Olson did not do so, however, because Plaintiff denied that this was a continuing concern, and because she did not observe any outward signs that would suggest otherwise. (*See id.* at 43, 47.) Moreover, as to Plaintiff remaining medical and mental health conditions and needs, Olson concluded that these matters could be addressed through routine, non-emergency care. Plainly, then, Olson cannot be said to have perceived that Plaintiff had serious medical needs, but then disregarded this perceived need for immediate treatment.

To be sure, Plaintiff faults Olson for being insufficiently thorough in her interview of Plaintiff, claiming that she "[s]pen[t] only three minutes" with Plaintiff despite "job duties [that] require[d] questions that would take longer than that to recite." (Plaintiff's Response Br. at 8–9.)[11] Yet, any such purported negligence in Olson's assessment of Plaintiff's medical needs does not rise to the level of deliberate indifference. *See Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 291–92; *Comstock*, 273 F.3d at 703. Nor can this be said to be a case in which a factfinder could permissibly "conclude that a prison official knew of

---

**11.** It is not clear where Plaintiff gets this "three minute" figure. Elsewhere in her brief, she asserts that Olson "spent no more than five minutes" with Plaintiff, (Plaintiff's Response Br. at 5), but in the testimony cited in support of this assertion, Olson stated her belief that her interview of Plaintiff lasted between five and fifteen minutes, (*see* Olson Dep. at 45–46).

a substantial risk from the very fact that the risk was obvious," *Farmer*, 511 U.S. at 842, 114 S.Ct. at 1981, where nothing in the record evidences an obvious heart condition. Finally, even if it could be said that Olson failed to sufficiently appreciate the warning signs of such a condition, the Supreme Court has explained that a prison employee is not deliberately indifferent to a detainee's medical needs if she "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844, 114 S.Ct. at 1982. Accordingly, Defendant Olson is entitled to summary judgment in her favor on Plaintiff's federal § 1983 claim.

The other individual Defendant who remains a party to this case is Nurse Peggy Osta. In her response to Defendants' motion, however, Plaintiff does not even mention Defendant Osta, much less attempt to rebut Defendants' contention that she did not deny medical care to Plaintiff or otherwise act with deliberate indifference to Plaintiff's serious medical needs in her efforts to revive this inmate. Consequently, the Court deems Plaintiff's claims against Defendant Osta to have been abandoned.

## C. Plaintiff's § 1983 Claim Against Defendant Oakland County

■ The sole remaining federal claim asserted by Plaintiff is a § 1983 claim against Defendant Oakland County. Under familiar principles, this governmental Defendant "cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir.2000) (citing *Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978)). Instead, "[f]or liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort." *Gregory*, 220 F.3d at 441. Moreover, Plaintiff must establish that "through its

deliberate conduct, the [County] was the 'moving force' behind" the violation of her constitutional rights—that is, she "must show that the [County's] action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the [County's] action and the deprivation of federal rights." *Gregory*, 220 F.3d at 442 (quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 1389, 137 L.Ed.2d 626 (1997)).

■ Plaintiff's § 1983 claim against Oakland County fails on two grounds. First, having failed to establish a constitutional violation by either of the two individual Defendants, Plaintiff cannot succeed on her claim against the County. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir.2001); *Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir.2000). Next, in her three-sentence rebuttal to Defendants' argument on this point, (*see* Plaintiff's Response Br. at 8), Plaintiff does not even attempt to forge the requisite link between a government custom or policy—here, a purported failure to ensure that jail employees were familiar with and adhered to the relevant County policies and procedures—and an alleged violation of her constitutional right to medical care for her serious medical needs. Rather, she merely speculates, without any specific factual basis, that her treatment would have been different if the jail employees with whom she interacted had acted in accordance with these policies and procedures. This is insufficient to raise an issue of fact as to whether a County custom or policy was the "moving force" behind a violation of Plaintiff's Eighth Amendment rights. Thus, the Defendant County is entitled to summary judgment in its favor on Plaintiff's § 1983 claim.

#### D. Plaintiff's State–Law Claims of Gross Negligence

█ In Count II of her complaint, Plaintiff seeks to impose tort liability upon Defendants under Michigan law for their alleged lack of reasonable care in providing necessary medical attention during Plaintiff's incarceration in the Oakland County Jail. As Plaintiff evidently recognizes, this state-law claim cannot succeed against the Defendant County, where it is clear that the County's operation of the jail constituted the "exercise of a governmental function." Mich. Comp. Laws § 691.1407(1). Moreover, and as discussed earlier, Plaintiff has evidently abandoned all of her claims, state and federal alike, against Defendant Osta.

Accordingly, Plaintiff's sole remaining state-law claim is against Defendant Olson. Under Michigan's governmental immunity statute, Olson is subject to tort liability only if her conduct "amount[s] to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2)(c). This statute defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(7)(a); *see also Jackson v. County of Saginaw,* 458 Mich. 141, 580 N.W.2d 870, 874 (1998). The question whether a government employee's conduct amounts to gross negligence may be decided as a matter of law "if, on the basis of the evidence presented, reasonable minds could not differ" on the outcome of this inquiry. *Jackson,* 580 N.W.2d at 873 (internal quotation marks and citation omitted).

█ Although the Michigan statute sets a lower threshold for liability than the "deliberate indifference" standard that governs Plaintiff's federal claims, the Court nonetheless concludes as a matter of law that Defendant Olson's conduct in this case did not reach even this lower state-law standard. As discussed earlier, Olson did not act with a "substantial lack of concern" in her interaction with Plaintiff, but instead made efforts to ascertain Plaintiff's medical and mental health needs and to secure treatment for these conditions. While Plaintiff faults her for failing to secure immediate medical treatment for a condition that shortly would result in Plaintiff's death, Olson's conduct in this regard cannot be characterized as "reckless," where the record before her did not disclose any diagnosis of this condition and Plaintiff herself denied in Olson's interview that her recent bout of chest pain remained an ongoing concern. Accordingly, for the same reasons discussed earlier as to the federal Eighth Amendment standard of deliberate indifference, the Court finds as a matter of law that Defendant Olson's conduct did not amount to "gross negligence" as defined by Michigan's governmental immunity statute. It follows that Olson is entitled to immunity from liability for the state-law tort claim asserted in Count II of Plaintiff's complaint.

### IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' July 2, 2007 motion for summary judgment (docket # 33) is GRANTED. In light of this ruling, IT IS FURTHER ORDERED that Defendants' July 2, 2007 motion in limine (docket # 35) is DENIED AS MOOT.